## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy Case No. 13 B 09806 |
| | ) | |
| THOMAS ABRAHAM, | ) | |
| | ) | |
| Debtor. | ) | Honorable Janet S. Baer |
| ——————————————— | ) | |
| | ) | |
| JACOB THAZHATHUPUTHENPURAC, | ) | Adversary Case No. 13 A 00917 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THOMAS ABRAHAM, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |

### MEMORANDUM OPINION

Plaintiff Jacob Thazhathuputhenpurac (the "Plaintiff") filed a three-count adversary complaint against debtor-defendant Thomas Abraham (the "Debtor"), seeking a determination that a judgment debt owed to him by the Debtor is not dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(4) and objecting to the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(3).[1] The matter is now before the Court on the parties' cross-motions for summary judgment on the nondischargeability claims under §§ 523(a)(2)(A) and (a)(4) in Counts I and II of the complaint.[2] For the reasons set forth below, the Court finds that there are no genuine issues of material fact and

---

[1] Unless otherwise noted, all statutory and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532, and the Federal Rules of Bankruptcy Procedure.

[2] Both motions for summary judgment are inaccurately captioned. The Plaintiff captions his as a "motion for summary judgment," but it is technically a motion for partial summary judgment because it relates only to the Plaintiff's nondischargeability claims. The Debtor captions his as a "motion for partial summary judgment," but he addresses all three counts in the adversary complaint.

that the Plaintiff is entitled to judgment as a matter of law on those claims in Counts I and II.  As such, the Plaintiff's motion will be granted, and judgment will be entered in the Plaintiff's favor. The Debtor's motion for summary judgment on all three counts will be denied.

## BACKGROUND

The material facts in this case are gleaned from the docket, the pleadings, and the summary judgment statements and responses, as well as the exhibits attached thereto.  Among those exhibits are an initial judgment order and two subsequent orders, all entered in favor of the Plaintiff and against the Debtor by the Circuit Court of Cook County (the "state court") after conducting a four-day bench trial; an order entered by the Appellate Court of Illinois, First District (the "appellate court") affirming the state court's judgment; and the four transcripts from the state court trial. (*See* Adv. No. 13-00917, Docket No. 67, Exs. A(1)-(3) & C-G.[3])  Virtually all of the facts that follow are drawn from these exhibits and, unless otherwise noted, are undisputed by the parties.[4]

The Plaintiff and the Debtor had been friends since childhood.  In 1997, they decided to invest in JT Enterprises of Chicago, Inc. ("JT"), a newly-established corporation whose business was the operation of a Shell gasoline station and convenience store in Chicago Ridge, Illinois.  The property on which the gas station was located was leased by JT from Shell.  To pay the purchase price for the station of about $320,000, the Plaintiff and the Debtor each invested $115,000 and then financed the remaining balance by taking out a loan for $90,000.  Although they intended to be equal shareholders, Shell required that one hold 51% of the shares.  Accordingly, the Plaintiff and the

---

[3] Unless otherwise noted, all docket references are to Adv. No. 13-00917.

[4] Unless otherwise noted, the facts below come from the initial judgment order entered by the state court, although many of them also appear in various other documents submitted by the parties.  The initial state court order can be found in Exhibit A-1 attached to both the Plaintiff's and the Debtor's Rule 7056-1 Statements of Facts. (*See* Docket Nos. 67 & 71.)

Debtor agreed that the Debtor would be the majority shareholder.

In 1999, the Debtor formed a second corporation called TVA of which he was the sole shareholder. The business of TVA was the operation of a Shell gas station, convenience store, and car wash in Bridgeview, Illinois. (Docket No. 67, Ex. A-1 at 2 & Ex. E at 9:13-10:3.) TVA also leased the property on which the station was located from Shell. In addition to TVA, the Debtor solely-owned another corporation called G&P whose business, like JT's and TVA's, was the operation of a gas station. (Docket No. 67, Ex. C at 33:17-20 & Ex. G ¶ 6.)

From 1997 to 2002, the Plaintiff worked for JT, managing the gas station on a full-time basis. In addition to supervising JT's employees, he was responsible for the cash, stocked merchandise in the convenience store, kept the daily receipt book, paid vendors, and performed various other tasks in connection with the operation of the station. Although the Debtor was employed by the United States Postal Service during this time, he would often meet with the Plaintiff to discuss JT's business. Additionally, the Debtor handled the rent, dealt with the banks, communicated with the accountant, took care of most of the fiscal issues in connection with JT, and made the financial decisions for the business.

At some point in 2001, the Plaintiff experienced health problems and, as a result, stopped working at JT. Although he returned to work in December 2001, he left again in April 2002 after a dispute arose between him and the Debtor. Not surprisingly, the parties characterize the Plaintiff's departure in contrasting ways. According to the Plaintiff, the Debtor took the Plaintiff's keys and "kicked him out." (Docket No. 67, Ex. A-1 at 2; *see also* Docket No. 67, Ex. C at 47:4, 75:3-4.) According to the Debtor, the Plaintiff "walk[ed] away" from the business. (Docket No. 67, Ex. A-1 at 5; *see also* Docket No. 67, Ex. C at 35:8-10 & Ex. F at 57:20-21.) Four months later, in August

3

2002, the Plaintiff relocated to Florida and notified the Debtor of his move. Despite his relocation, the Plaintiff remained a shareholder of JT and tried to contact the Debtor on a monthly basis. Although the Debtor had the Plaintiff's phone number, at no time did he ask the Plaintiff for his new address in Florida.

In November 2001, Shell announced a substantial rent increase that would almost double the rent to be paid by JT and TVA beginning in 2002. In response, the Plaintiff and the Debtor decided to sue Shell on behalf of JT, and TVA sued as well.

The case against Shell was complex and lasted for years. Finally, in 2005, the parties were able to reach an agreement, and the case settled. The Debtor signed the settlement agreement on behalf of both JT and TVA. As part of the agreement, the Debtor surrendered JT to Shell, Shell sold and TVA bought the Bridgeview property, and Shell lowered the purchase price of the Bridgeview property by $225,000. JT received virtually nothing under the settlement agreement, despite the fact that its tax returns reflected assets of $229,000. Instead, JT returned its gas station to Shell, and Shell bought JT's inventory.

The Debtor never discussed the settlement with the Plaintiff, nor did he inform the attorney representing JT and TVA in the Shell litigation of the Plaintiff's existence or his stake in JT. In fact, the attorney did not become aware of the Plaintiff's involvement in JT until 2010.

TVA closed in February 2005. Four months later, in June 2005, the Debtor closed JT, without contacting or informing the Plaintiff about the closure. Subsequently, in January 2006, JT was involuntarily dissolved by the State of Illinois. (Docket No. 67, Ex. D at 56:3-5 & Ex. G at 2 n.1.)

Throughout the years that JT was in business, the Debtor transferred money back and forth

4

among JT, TVA, and G&P. He never told the Plaintiff about these transfers, nor did he ever get the Plaintiff's consent to make them. Between 2003 and 2006, the net total of transfers from JT to TVA was $67,027, and the net total from JT to G&P was $107,850.

On May 1, 2006, the Plaintiff filed a three-count complaint against JT and the Debtor in the state court. (Docket No. 67, Ex. G ¶ 14.) Count I alleged violation of § 12.56 of the Illinois Business Corporation Act, 805 ILCS 5/12.56 ("Shareholder remedies: non-public corporations"); Count II alleged tortious interference with prospective business; and Count III sought an accounting. (Docket No. 67, Ex. G ¶ 14.) In response, JT and the Debtor filed a counterclaim in which they alleged breach of fiduciary duty. *(Id.)*

On March 30, 2012, after almost six years of litigation and a four-day bench trial, the state court entered judgment in favor of the Plaintiff and against JT and the Debtor in the amount of $158,699.73, plus attorneys' fees. (Docket No. 67, Exs. A & C-F.) The court also found against JT and the Debtor on their counterclaim. In reaching its decision, the state court entered an order setting out the facts detailed above and, from those facts, concluding that: (1) the Debtor "engaged in self-dealing" throughout the years at issue; (2) the Plaintiff did not "abandon" or "walk away" from JT by moving to Florida; (3) the Plaintiff remained a shareholder, officer, and director of JT after his relocation; (4) the entire benefit of the settlement agreement with Shell went to TVA; (5) JT did not "share in the $225,000 price reduction"; (6) the Debtor "consistently transferred money" among the three corporations; (7) the Plaintiff was entitled to 49% of the "wrongfully diverted funds" and "one-half of the amount of benefit that JT should have received as a result of the settlement agreement"; and (8) the Debtor destroyed financial records of JT, making the records that remained unreliable. (Docket No. 67, Ex. A-1 at 3-5.) In sum, the state court found that in order to engage in self-dealing,

5

the Debtor "froze [the] Plaintiff out" by refusing to share information with him, by failing to keep

him informed, and by not including him in decision making. (*Id.* at 5-6.)

On October 18, 2012, about seven months after entry of the order, the state court modified

the judgment in the amount of $103,574.73, plus attorneys' fees. (Docket No. 67, Ex. A-2.) And

on February 8, 2013, the court entered an order awarding $16,641.69 in attorneys' fees and $352 in

costs as part of the judgment.[5] (Docket No. 67, Ex. A-3.)

Shortly thereafter, on March 12, 2013, the Debtor filed a voluntary petition for relief under

chapter 7 of the Bankruptcy Code. (Bankr. No. 13-09806, Docket No. 1.) About three months later,

on June 28, 2013, the Plaintiff filed an adversary complaint against the Debtor, seeking a

determination that the state court judgment is excepted from discharge pursuant to §§ 523(a)(2)(A)

and (a)(4) and objecting to the Debtor's discharge under § 727(a)(3). (Adv. No. 13-00917, Docket

No. 1.) Subsequently, on January 28 and 29, 2014, the parties filed cross-motions for summary

judgment, the Plaintiff on the nondischargeability claims in Counts I and II and the Debtor on all

three claims. (Docket Nos. 16 & 20.) After the motions were fully briefed and a hearing was

conducted on May 21, 2014, the Court denied both motions without prejudice and modified the

automatic stay to allow the parties to proceed with a previously-filed appeal of the state court

judgment. (Docket Nos. 49-51.)

On December 7, 2016, the appellate court issued an order affirming the judgment of the state

court. (Docket No. 67, Ex. G.) Thereafter, the Debtor filed a petition for re-hearing in the appellate

court. That petition was denied on February 16, 2017. (Docket No. 67, Ex. H.)

---

[5] For the sake of simplicity, the Court will hereafter refer to the orders entered by the state court collectively as "the state court judgment" or "the judgment of the state court."

About four months later, on June 20, 2017, the parties filed the instant amended cross-motions for summary judgment. (Docket Nos. 66 & 69.) The motions have been fully briefed and are now ready for ruling.

## SUMMARY JUDGMENT

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (made applicable to adversary proceedings by Fed. R. Bankr. P. 7056). The primary purpose of the summary judgment procedure is to avoid unnecessary trials where no material facts are in dispute. *See Trautvetter v. Quick*, 916 F.2d 1140, 1147 (7th Cir. 1990); *Farries v. Stanadyne/Chi. Div.*, 832 F.2d 374, 378 (7th Cir. 1987) (quoting *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n of Indianapolis*, 806 F.2d 146, 149 (7th Cir. 1986)). Thus, on a motion for summary judgment, the court must decide, based on the evidence, whether there is a material disputed fact that requires a trial. *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the material facts are not in dispute, the only issue is whether the moving party is entitled to judgment as a matter of law. *ANR Advance Transp. Co. v. Int'l Bhd. of Teamsters, Local 710*, 153 F.3d 774, 777 (7th Cir. 1998).

A careful review of the parties' statements and responses filed in connection with their cross-motions for summary judgment reveals that there are no material facts in dispute, and neither the Plaintiff nor the Debtor argues otherwise. Thus, the only question to be considered is whether either party is entitled to judgment as a matter of law.

In his motion for summary judgment, the Plaintiff contends that he is entitled to judgment as a matter of law through the application of collateral estoppel. Under that doctrine, the Plaintiff argues, the Debtor is precluded from re-litigating the factual issues decided by the state court and those facts establish, as a matter of law, that the debt at issue is nondischargeable pursuant to §§ 523(a)(2)(A) and (a)(4). In response, the Debtor argues that the state court judgment does not establish any of the Plaintiff's claims and that, thus, the Plaintiff's motion for summary judgment should be denied.[6]

The Debtor makes the same argument in his own motion for summary judgment. In fact, the Debtor's *sole* contention in his motion is that collateral estoppel does not apply because the state court findings do not satisfy the elements of the exceptions to discharge invoked by the Plaintiff. (*See* Docket No. 70, at 1.) Even if the Court were persuaded by that argument, the Debtor has failed to provide any theory under which he is entitled to judgment as a matter of law. Arguing that collateral estoppel does not apply is simply not enough. Therefore, the Debtor's motion for summary judgment must be denied, and all that remains for consideration is whether the Plaintiff is entitled to judgment as a matter of law.

## JURISDICTION

Before turning to the parties' arguments on the applicability of collateral estoppel in this matter, the Court addresses the Plaintiff's assertion that the Rooker-Feldman doctrine precludes the Court from reviewing, overturning, modifying, or otherwise rejecting the judgment entered against

---

[6] In both his response to the Plaintiff's motion for summary judgment and his own summary judgment motion, the Debtor argues that the state court judgment supports neither the Plaintiff's nondischargeability claims under § 523 nor his objection to the Debtor's discharge under § 727. The Plaintiff, however, has not moved for summary judgment in connection with his objection to the Debtor's discharge.

the Debtor in the state court. Specifically, the Plaintiff argues that should the Debtor deny liability

or ask the Court to modify the state court judgment, the Court lacks the jurisdiction to do so pursuant

to the Rooker-Feldman doctrine. The Plaintiff's argument is meritorious but irrelevant here.

The Debtor does not challenge the state court judgment and, in fact, properly sought review

of that judgment through a state court appeal. Nor is the Court being called upon to review the state

court judgment and need not overturn, modify, or reject it in order to determine the interests of the

parties. *See Zurich Am. Ins. Co. v. Superior Ct. of Cal.*, 326 F.3d 816, 823 (7th Cir. 2003)

(explaining that the key question in every Rooker-Feldman analysis is whether the federal court "is

in essence being called upon to review the state-court [decision]" (internal quotations omitted));

*Epps v. Credinet, Inc.*, 320 F.3d 756, 759 (7th Cir. 2003) (noting that if "success in the federal court

would require overturning the state court decision," then the federal court lacks jurisdiction over the

claim). Rather, as discussed *infra*, the Court must decide only whether the findings in the state court

judgment are sufficient to except that judgment from discharge in bankruptcy.

Accordingly, the Court has jurisdiction to determine the interests of the parties in this matter.

That jurisdiction is conferred by 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the

United States District Court for the Northern District of Illinois. The matter is a core proceeding

under 28 U.S.C. § 157(b)(2)(I).[7]

---

[7] In his motion for summary judgment, the Plaintiff also argues that the three jurisdiction-based defenses asserted by the Debtor in his amended answer–lack of standing, lack of subject matter jurisdiction, and derivative suit required for claims of self-dealing–are without merit. In advancing those defenses, the Debtor primarily argues that the relief that the Plaintiff seeks under § 12.56 of the Business Corporation Act (the "BCA") needs to be brought derivatively on behalf of the corporation–not directly by the Plaintiff. (*See* Docket No. 11 at 10-12.)

Nothing in § 12.56, or the case law construing it, requires an action to be brought derivatively. *See* 805 ILCS 5/12.56; *see also, e.g., Lohr v. Havens*, 879 N.E.2d 386, 388 (Ill. App. Ct. 2007); *Midkiff v. Gingrich*, 824 N.E.2d 1144, 1145 (Ill. App. Ct. 2005). Indeed, in his memorandum in opposition to the Plaintiff's initially-filed motion for summary judgment, the Debtor stated that to the extent that the Plaintiff conceded that he was proceeding under only § 12.56 of the BCA, the Debtor's jurisdictional defenses did not apply. (Docket No. 29, at 11-12.) More

## DISCUSSION

Bankruptcy courts ordinarily make independent decisions as to whether debts are nondischargeable under the various provisions of § 523(a). *See Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir. 1994). It is well established, however, that the doctrine of collateral estoppel, or issue preclusion, applies in bankruptcy discharge exception proceedings. *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991); *Klingman v. Levinson*, 831 F.2d 1292, 1294-95 (7th Cir. 1987). Accordingly, "if a court of competent jurisdiction has previously entered judgment against [a] debtor," collateral estoppel may bar the debtor from re-litigating "the underlying facts in the bankruptcy court." *Meyer*, 36 F.3d at 1378. Indeed, a bankruptcy court can find that a debt is nondischargeable based *solely* on the evidence of the prior proceeding, as long as the judgment in that proceeding was obtained fairly, the defendant was accorded due process, the complaint and judgment order are unambiguous that the judgment debt is "of a non-dischargeable nature," and the record from the prior proceeding is before the bankruptcy court. *U.S. Life Title Ins. Co. of N.Y. v. Wade (In re Wade)*, 26 B.R. 477, 481 (Bankr. N.D. Ill. 1983). By precluding the re-litigation of the same factual issues between the same parties, collateral estoppel preserves judicial resources, lessens the cost and vexation of multiple lawsuits, and prevents the issuance of inconsistent decisions. *Allen v. McCurry*, 449 U.S. 90, 94 (1980); *Sylvester v. Martin (In re Martin)*, 130 B.R. 930, 942 (Bankr. N.D. Ill. 1991).

Where a prior judgment was issued by a state court, the collateral estoppel of that state

---

importantly, however, the Debtor's argument that the Plaintiff's action here must be brought derivatively under the BCA completely misses the mark. The Plaintiff alleges in this matter that the debt at issue is nondischargeable pursuant to §§ 523(a)(2)(A) and (a)(4), not § 12.56.

In any event, the Debtor fails to address in his memorandum in opposition to the Plaintiff's current motion for summary judgment any of the asserted jurisdictional defenses, and, thus, those defenses are waived. *See Bank of Am., N.A. v. Yang,* Case No. 12 cv 7480, 2014 WL 2208951, at *3 (N.D. Ill. May 27, 2014) (explaining that "affirmative defenses that are not raised by the non-movant in response to a summary judgment motion are waived").

governs. *Gambino v. Koonce*, 757 F.3d 604, 608 (7th Cir. 2014). Because the judgment against the

Debtor was entered in an Illinois state court, the Illinois law of collateral estoppel applies. The

elements of collateral estoppel under Illinois law are as follows:  (1) a prior case presented an

identical issue; (2) the case ended in a final judgment on the merits; and (3) the party against whom

estoppel is asserted was a party in the prior case. *Id.*; *Wians v. Wians (In re Wians)*, 523 B.R. 124,

129 (Bankr. N.D. Ill. 2014).

Only the first element is in dispute in this matter. The Plaintiff argues that the issues at bar

are identical to those in the state court proceedings for purposes of collateral estoppel because the

state court's findings satisfy the elements required for nondischargeability under §§ 523(a)(2)(A) and

(a)(4).  The Debtor disagrees.  He argues that the elements needed to prevail under the Illinois

Business Corporation Act (the "BCA"), under which the state court complaint was brought, are not

identical to those required under the exceptions to discharge invoked by the Plaintiff and that,

therefore, the preclusive effect of collateral estoppel is not applicable here.

The Debtor's argument is erroneous.  It confuses the doctrine of res judicata, or claim

preclusion, with the doctrine of collateral estoppel.  "Under res judicata, a final judgment on the

merits bars further claims by [the] parties . . . based on the same cause of action." *Montana v. United

States*, 440 U.S. 147, 153 (1979).  In contrast, "[u]nder collateral estoppel, once an issue is actually

and necessarily determined by a court of competent jurisdiction, that determination is conclusive in

subsequent suits *based on a different cause of action* involving a party to the prior litigation." *Id.*

(emphasis added); *see also Dexia Crédit Local v. Rogan*, 629 F.3d 612, 628 (7th Cir. 2010)

(explaining that collateral estoppel "bars successive litigation of an issue of fact or law actually

litigated and resolved in a valid court determination essential to the prior judgment, even if the issue

recurs in the context of a different claim"); *S. Cal. Gas Co. v. Collier*, Bankr. No. 08 B 22708, Adv.

No. 08 A 01008, 2010 WL 1241778, at *2 (Bankr. N.D. Ill. Mar. 23, 2010) (stating that "[c]ollateral

estoppel forecloses relitigation of legal and factual issues even if they arise in a new legal claim in

the second case").

Contrary to the Debtor's claim, the court in a prior action need not use the specific words or

phrases found in the elements of a statutory exception to discharge in order for collateral estoppel

to apply.[8]  As long as that court's findings of fact, when viewed in the aggregate, "independently

comprise elements of a [subsequent] dischargeability claim, collateral estoppel precludes the debtor

from relitigating those underlying facts in bankruptcy court." *French Kezelis & Kominiarek, P.C.*

*v. Carlson*, No. 99 C 6020, 2000 WL 226706, at *4 (N.D. Ill. Feb. 22, 2000) (citing *Klingman*, 831

F.2d at 1294-95).

As discussed more extensively below, the Court finds that the issues sought to be precluded

in this matter are the same as those that came before the state court for purposes of collateral

estoppel. The inquiry decided by the state court under § 12.56 of the BCA mirrors the current inquiry

before this Court under §§ 523(a)(2)(A) and (a)(4). Under § 12.56, the state court examined whether

the Plaintiff acted "in a manner that [was] illegal, oppressive, or fraudulent with respect to" the

Debtor and whether the "corporation assets [were] being misapplied or wasted." *See* 805 ILCS

5/12.56(a)(3) & (4). The issue to be determined under §§ 523(a)(2)(A) and (a)(4) is whether the

Plaintiff acted fraudulently in connection with obtaining the money from which the judgment debt

---

[8] As the Plaintiff quite rightly observes, conditioning the application of collateral estoppel on the prior court's use of the express words in the bankruptcy nondischargeability statutes would require that court to *anticipate* that a losing party might file for bankruptcy. (*See* Docket No. 76 at 2 n.1.) Such a requirement would be unreasonable and ludicrous.

arose and whether he committed fraud or defalcation while acting in a fiduciary capacity. Accordingly, the "identical issue" element required under collateral estoppel is satisfied.

## A. Section 523(a)(2)(A)

The Plaintiff contends that he is entitled to judgment as a matter of law under § 523(a)(2)(A) because the state court's findings satisfy the elements required for nondischargeability under that statutory exception. Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]"   11 U.S.C. § 523(a)(2)(A).   Three separate grounds for dischargeability are included under § 523(a)(2)(A): false pretenses, false representation, and actual fraud. The Plaintiff invokes all three in his motion for summary judgment.

To except the judgment debt from discharge based on false pretenses or false representation under § 523(a)(2)(A), the Plaintiff must show by a preponderance of the evidence that: (1) the Debtor made a false representation or omission of fact, (2) which the Debtor (a) either knew was false or made with reckless disregard for its truth, and (b) made with an intent to deceive, (3) upon which the Plaintiff justifiably relied. *See Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011); *see also Grogan*, 498 U.S. at 291.

A false representation is an express misrepresentation that can be demonstrated either by a spoken or written statement or through conduct. *New Austin Roosevelt Currency Exch., Inc. v. Sanchez (In re Sanchez)*, 277 B.R. 904, 908 (Bankr. N.D. Ill. 2002); *Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 700 (Bankr. N.D. Ill. 2002). "[A] debtor's silence regarding a material

13

fact can constitute a false representation" as well. *Zamora v. Jacobs (In re Jacobs)*, 448 B.R. 453, 471 (Bankr. N.D. Ill. 2011) (internal quotation omitted).

In contrast, false pretenses include "implied misrepresentations or conduct intended to create or foster a false impression." *Baermann v. Ryan (In re Ryan)*, 408 B.R. 143, 157 (Bankr. N.D. Ill. 2009). "The implication arises when a debtor, with the intent to mislead a creditor, engages in 'a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances . . . or [a false and misleading] understanding of a transaction . . ..'" *Muhammad v. Sneed (In re Sneed)*, 543 B.R. 848, 859 (Bankr. N.D. Ill. 2015) (quoting *Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996)). False pretenses do not require overt misrepresentations. *Mem'l Hosp. v. Samara (In re Samara)*, 192 B.R. 922, 928 (Bankr. N.D. Ill. 1996). Rather, "omissions or a failure to disclose on the part of a debtor can constitute misrepresentations" for purposes of false pretenses, "where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.* A creditor can also satisfy the first element of a claim of false pretenses by showing that the debtor concealed a material fact. *See Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 772 (Bankr. N.D. Ill. 2010), *aff'd*, 470 B.R. 808 (N.D. Ill. 2012); *see also Shelby Shore Drugs, Inc. v. Sielschott (In re Sielschott)*, 332 B.R. 570, 573 (Bankr. C.D. Ill. 2005).

Reliance on a false pretense or false representation under § 523(a)(2)(A) must be "justifiable." *Field v. Mans*, 516 U.S. 59, 70-71 (1995). Justifiable reliance is subjective; what is justifiable depends on the characteristics of the particular plaintiff and the circumstances of the particular case. *Id.* at 71; *Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002). The requirement that reliance be justifiable imposes no affirmative duty to

14

investigate unless "the falsity of the representation is easily detectable," *Dobek*, 278 B.R. at 508, but a creditor cannot "bury his head in the sand" and "ignore obvious falsehoods," *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 315 (Bankr. N.D. Ill. 2001) (internal quotation omitted).

Unlike false pretenses and false representation, "actual fraud" requires neither a misrepresentation, *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016), nor reliance, *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000).   Encompassing a broad spectrum of circumstances, it consists of "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another[.]" *Id.* at 893 (internal quotation omitted). "Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth." *Id.* It includes "anything calculated to deceive, whether it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture." *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 531 (7th Cir. 1992) (internal quotation omitted). In order to establish a claim based on "actual fraud," a creditor must prove that: (1) actual fraud occurred; (2) the debtor intended to defraud the creditor; and (3) the debtor's actual fraud created the debt at issue. *Jairath*, 259 B.R. at 314.

To prevail on any cause of action under § 523(a)(2)(A), the Plaintiff must prove that the Debtor subjectively intended to deceive the Plaintiff at the time the misrepresentations were made or the fraudulent conduct occurred. *See Gasunas v. Yotis (In re Yotis)*, 548 B.R. 485, 495 (Bankr. N.D. Ill. 2016); *Sneed*, 543 B.R. at 862; *Ryan*, 408 B.R. at 157-58. Because direct proof is rarely available, intent to deceive "may be determined from the totality of the circumstances of a case and

15

may be inferred when the facts and circumstances present a picture of deceptive conduct on the debtor's part." *Cent. Credit Union of Ill. v. Logan (In re Logan)*, 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005) (internal quotation omitted). Thus, where a debtor knowingly or recklessly made false representations that he knew or should have known would induce another to act, the court can infer an intent to deceive. *Hickory Point Bank & Trust, FSB v. Kucera (In re Kucera)*, 373 B.R. 878, 884 (Bankr. C.D. Ill. 2007). In the same way, fraud may be inferred if the circumstances collectively suggest that the debtor intended to cheat or otherwise deceive the creditor. *Ryan*, 408 B.R. at 157.

In this matter, the findings of the state court amply provide the necessary factual support for nondischargeability under all three prongs of § 523(a)(2)(A). Those findings establish that the Debtor: (1) made false representations by failing to disclose to the Plaintiff pertinent information regarding a number of material facts in connection with JT; (2) created a false impression about the continuing viability of JT and the outcome of the settlement with Shell; and (3) engaged in "self-dealing" and other deceitful conduct designed to cheat the Plaintiff.

According to the state court findings, after the Plaintiff moved to Florida, the Debtor neither kept him informed about the financial condition of JT and the settlement with Shell, nor included him in decision making in connection with JT, despite the fact that the Plaintiff remained a shareholder, officer, and director of the corporation. Specifically, the state court found that the Debtor never discussed the settlement with the Plaintiff, even though he had the Plaintiff's new telephone number in Florida. Without talking to the Plaintiff or getting his consent, the Debtor signed the settlement agreement on behalf of both JT and TVA, surrendered JT to Shell pursuant to that agreement, and "pocketed the entire proceeds from the settlement agreement" by applying the full settlement of $225,000 to TVA's purchase of the Bridgeview property. (Docket No. 67, Ex. A-1

at 4.) The state court further found that the Debtor never told the attorney representing JT and TVA in the Shell litigation of the Plaintiff's existence or the fact that he was a shareholder of JT; that the Debtor transferred money from JT to TVA and G&P without the Plaintiff's knowledge or permission; and that he even closed JT without contacting or informing the Plaintiff of the shutdown. Ultimately, the state court found that by failing to provide the Plaintiff with information, the Debtor "froze him out of JT" so that the Debtor could "engage in self-dealing." (*Id.* at 6.) In doing so, the Debtor's conduct created a false and contrived "set of circumstances" that misled the Plaintiff, deceived him, and allowed the Debtor to gain an advantage over him.

The state court findings further demonstrate that the Plaintiff's reliance on the Debtor's misrepresentations, and the false impression that they created, was justifiable. According to those findings, the Plaintiff and the Debtor together decided to sue Shell on behalf of JT in connection with the then-imminent rent increase. The ensuing litigation was complicated and went on for years. Because the Plaintiff was living out of state by then, he justifiably relied on the Debtor to both oversee and report on the litigation, as well as any other relevant activities pertaining to the operation of JT. As to the Plaintiff's obligation to conduct an investigation, rather than simply rely on the Debtor's representations, the state court found that the Plaintiff tried to contact the Debtor on a monthly basis after his relocation. Notwithstanding those attempts, the state court determined that the Debtor "refused to share information with [the] Plaintiff" and otherwise "keep him informed." (*Id.* at 5-6.) Thus, the Debtor's misrepresentations were not "easily detectable," and, accordingly, the Plaintiff had no affirmative duty to investigate.

Finally, as to the intent element, the factual findings of the state court establish that, once the Plaintiff moved to Florida, the Debtor knowingly engaged in a pattern of activity designed to "freeze

out" the Plaintiff and keep him from knowing anything about JT's financial affairs. Based on those

findings, the state court concluded that the Debtor engaged in self-dealing, both by "wrongfully"

diverting funds from JT to his two other corporations and by retaining the entire benefit of the

settlement agreement with Shell. (*Id.* at 3-4.) Additionally, the state court found that the Debtor

tried to conceal his self-dealing from the Plaintiff, by failing to communicate with the Plaintiff,

refusing to include him in decision making, and destroying relevant financial business records.

In short, the Debtor's deliberate silence as to material facts affecting JT, his self-interested

business decisions, and his attempts to conceal his self-dealing "present a picture of deceptive

conduct" on the Debtor's part, and the totality of the circumstances suggests that he intended to cheat

or otherwise deceive the Plaintiff. The requirement that the Debtor's fraud created the debt at issue

is also satisfied, because the state court clearly grounded its judgment on the Debtor's deceitful

conduct.

Based on the foregoing, the Court concludes that the state court's detailed findings of fact

satisfy all of the elements required for nondischargeability pursuant to all three prongs of §

523(a)(2)(A). Thus, the Plaintiff is entitled to judgment as a matter of law under that statutory

exception to discharge.

## B. Section 523(a)(4)

Next, the Plaintiff contends that he is entitled to judgment as a matter of law pursuant to §

523(a)(4) because the state court findings establish the elements for nondischargeability under that

statute. Section 523(a)(4) provides that a debtor cannot discharge any debt "for fraud or defalcation

while acting in a fiduciary capacity, embezzlement, or larceny[.]" 11 U.S.C. § 523(a)(4). Thus, to

demonstrate a claim under § 523(a)(4), the Plaintiff must prove that the Debtor committed: (1) fraud

18

or defalcation while acting as a fiduciary; or (2) embezzlement; or (3) larceny. *See id.* The Plaintiff

has invoked only the fraud or defalcation prong of the statutory exception.

In order to prevail under that prong, the Plaintiff must establish the following elements by

a preponderance of the evidence: (1) the existence of an express trust or fiduciary relationship

between him and the Debtor; and (2) fraud or defalcation committed by the Debtor in the course of

that relationship. *See Follett Higher Educ. Grp., Inc. v. Berman (In re Berman)*, 629 F.3d 761, 765-

66 (7th Cir. 2011); *Kafantaris v. Signore*, Nos. 10 C 7320, 09 B 13534, 09 A 667, 2011 WL

1743416, at *3 (N.D. Ill. May 5, 2011); *Jacobs*, 448 B.R. at 477; *see also Grogan*, 498 U.S. at 291.

The Plaintiff does not allege that an express trust existed between him and the Debtor; rather,

he contends that there was a fiduciary relationship between the parties. The existence of a fiduciary

relationship under § 523(a)(4) is a matter of federal law. *In re McGee*, 353 F.3d 537, 540 (7th Cir.

2003); *Schaffer v. Dempster (In re Dempster)*, 182 B.R. 790, 801 (Bankr. N.D. Ill. 1995). Although

"[b]ankruptcy law depends on, and implements, entitlements defined by state law . . ., which of these

entitlements is subject to discharge . . . is beyond state control." *McGee*, 353 F.3d at 540. Thus, the

Court turns to federal law to decide whether a fiduciary relationship existed between the Plaintiff and

the Debtor.

In the Seventh Circuit, a fiduciary relationship may arise for purposes of § 523(a)(4) when

there is "a difference in knowledge or power between fiduciary and principal which . . . gives the

former a position of ascendancy over the latter." *In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir.

1994); *Jacobs*, 448 B.R. at 477 (quoting *Marchiando*); *see also Berman*, 629 F.3d at 769-70

(explaining that a relationship "in which one party to the relation is incapable of monitoring the

other's performance" satisfies the § 523(a)(4) requirement (internal quotation omitted)); *McGee*, 353

F.3d at 541 (noting that "many fiduciary relations are characterized by disparities in the knowledge

. . . of the participants"). Only fiduciary duties existing prior to the debt fall within the ambit of the

statutory exception. *Berman*, 629 F.3d at 769.

In this matter, the state court's findings sufficiently establish that the Debtor had fiduciary

obligations to the Plaintiff for purposes of § 523(a)(4). That the parties were essentially equal

partners does not preclude a fiduciary relationship, because the ascendancy test "looks to economic

realities rather than labels." *See Catrambone v. Adams*, 498 B.R. 839, 848-49 (N.D. Ill. 2013). The

economic realities here reveal a substantial inequality in both knowledge and power between the

parties.

According to the state court's findings, only the Debtor effectively had knowledge about and

control of JT after the Plaintiff moved to Florida in 2002. True, the Plaintiff worked at the business

on a full-time basis from 1997 until his relocation, managing the gas station and performing various

tasks required for its operation. At all times, however, the Debtor handled most of JT's financial

issues and made all financial decisions on behalf of the corporation. More importantly, once the

Plaintiff moved out of state, the Debtor provided him with little to no information about the

operation or affairs of the corporation, and the concentration of power became substantially one-

sided. As discussed above, the Debtor took complete control of the company, unilaterally

transferring money from JT to his two other corporations and making significant decisions affecting

JT without contacting the Plaintiff, including him in the decision making, or getting his consent.

Because he was effectively "frozen out" of the business, the Plaintiff did not have access to even

basic information about JT and was incapable of monitoring the Debtor's conduct in connection with

the business, despite his efforts to contact the Debtor on a periodic basis.

Based on the state court's findings, the Court concludes that the Debtor had superior knowledge and power that gave him a position of ascendancy over the Plaintiff. Given that ascendant position, the Court holds that a fiduciary relationship existed between the parties for purposes of § 523(a)(4).

As for the second element of the statutory exception, the state court's findings also establish both defalcation and fraud. The Court will address each of these in turn.

Although not defined in the Bankruptcy Code, "defalcation" loosely means "'a nonfraudulent default.'" *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 272 (2013) (quoting *Black's Law Dictionary* 479 (9th ed. 2009)). The term has also been defined as the "failure to meet an obligation; [the] misappropriation of money held in a fiduciary capacity; [and the] failure to properly account for such funds." *Collier*, 2010 WL 1241778, at *4 (internal quotation omitted); *see also Zitt v. Roberts (In re Roberts)*, Nos. 10 B 06420, 10 A 01298, 2011 WL 4102540, at *7 (Bankr. N.D. Ill. Sept. 14, 2011).

Although intent or bad faith is not necessary, the United States Supreme Court has held that, for purposes of § 523(a)(4), defalcation requires knowledge of and gross recklessness with respect to the improper nature of the fiduciary's conduct. *Bullock*, 569 U.S. at 273-74; *see also Meyer*, 36 F.3d at 1385 (holding that defalcation requires at least reckless conduct). Specifically, the Supreme Court has explained that defalcation "requires an intentional wrong" and that "[w]here actual knowledge of wrongdoing is lacking, [the Court] consider[s] conduct as equivalent if the fiduciary consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty." *Bullock*, 569 U.S. at 273-74 (internal quotations omitted).

In this matter, the state court findings demonstrate that the Debtor failed to meet obligations

21

that he owed to the Plaintiff by virtue of his ascendant position in relation to the Plaintiff. According to the state court, the Debtor refused to share information about JT with the Plaintiff and misappropriated business funds by wrongly diverting money from JT to his two solely-owned corporations, failed to properly account for those funds, executed the settlement agreement with Shell, retained all of the proceeds from that agreement, and ultimately closed JT, all without ever contacting the Plaintiff or getting his authorization. Those findings sufficiently establish that the judgment debt at issue arose from a defalcation for purposes of § 523(a)(4).

The findings of the state court also provide the necessary factual support for the knowledge element under the statutory exception. Specifically, those findings establish that the Debtor knowingly remained silent about the financial activities of JT and the settlement of the litigation with Shell. He knew that his failure to contact the Plaintiff about business decisions and his execution of the settlement agreement were wrong, and he acted with gross recklessness, consciously disregarding the "substantial and unjustifiable risk" that his actions would result in the violation of his fiduciary duty to the Plaintiff. Given the nature and purpose of the Debtor's conduct and the fact that he knew that JT–and thus the Plaintiff–would receive essentially nothing under the settlement agreement, the Debtor's disregard of that risk was a "gross deviation from the standard of conduct that a law-abiding person would observe" in his situation. *See Bullock*, 569 U.S. at 274. Thus, the Court concludes, based on the state court's findings, that the Debtor committed defalcation while acting as a fiduciary to the Plaintiff under § 523(a)(4).

Despite the Debtor's claim that he did not intend to defraud the Plaintiff, the Court also finds that the Plaintiff has met his burden to establish that the Debtor committed fraud. As discussed above, the state court findings establish that the Debtor's conduct was intentionally deceitful. He

22

knowingly and purposefully refused to share material facts about JT with the Plaintiff, made self-serving business decisions, and then tried to conceal his self-dealing by destroying relevant business records. Despite the Debtor's claim that the state court did not make a specific finding of fraud, that court's findings of fact, when viewed in the aggregate, clearly establish the Debtor's fraudulent intent.

In sum, the Plaintiff has established that collateral estoppel applies and that the state court's findings independently comprise the elements of a nondischargeability claim under § 523(a)(4). The Debtor owed a fiduciary duty to the Plaintiff for purposes of the statutory exception by virtue of his superior knowledge and power, and he committed fraud and defalcation while acting as a fiduciary. The requirement that the fiduciary duty existed prior to the debt has also been satisfied, because the Debtor was clearly a fiduciary before the judgment debt arose. Accordingly, the Plaintiff is entitled to judgment as a matter of law pursuant to § 523(a)(4).

## CONCLUSION

For the foregoing reasons, the Court finds that the Debtor is precluded from re-litigating the factual issues decided by the state court and that those facts establish, as a matter of law, that the debt at issue is excepted from discharge pursuant to §§ 523(a)(2)(A) and (a)(4). As such, the Plaintiff's motion for partial summary judgment on Counts I and II will be granted, and judgment will be entered on the nondischargeability counts of the adversary complaint in favor of the Plaintiff. The Debtor's motion for summary judgment on all three counts will be denied. A separate order will be entered consistent with this Memorandum Opinion.

Dated:  **March 22, 2018**          **ENTERED:**

Janet S. Baer
United States Bankruptcy Judge